**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| IN RE REINZ WISCONSIN GASKET, LLC, a cancelled Delaware limited liability company | ) ) ) ) | C.A. No. 2022-0859-MTZ |

**MEMORANDUM OPINION**

Date Submitted: October 23, 2025
Date Decided: April 2, 2026

K. Tyler O'Connell, R. Eric Hacker, MORRIS JAMES LLP, Wilmington, Delaware; Charles W. Branham, III, Todd Barnes, DEAN OMAR BRANHAM SHIRLEY, LLP, Dallas, Texas, *Attorneys for Petitioner.*

Jody C. Barillare, Brian Loughnane, MORGAN, LEWIS & BOCKIUS LLP, Wilmington, Delaware; Laura H. McNally, MORGAN LEWIS & BOCKIUS LLP, Philadelphia, Pennsylvania, *Attorneys for Receiver Peter D. Protopapas.*

Kelly E. Farnan, Blake Rohrbacher, Mari Boyle, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *Attorneys for Intervenor DCo LLC.*

Jaclyn C. Marasco, FAEGRE DRINKER BIDDLE & REATH LLP, Wilmington, Delaware; Robert A. Kole, John C. Calhoun, CHOATE HALL & STEWART LLP, Boston, Massachusetts, *Attorneys for Intervenor Enstar (US) Inc.*

Douglas D. Herrmann, Emily L. Wheatley, TROUTMAN PEPPER LOCKE LLP, Wilmington, Delaware, *Attorneys for Intervenor Continental Casualty Company.*

Carmella P. Keener, COOCH AND TAYLOR, P.A., Wilmington, Delaware; Michael J. Cohen, James M. Sosnoski, MEISSNER TIERNEY FISHER & NICHOLS S.C., Milwaukee, Wisconsin, *Attorneys for Intervenor Nationwide Indemnity Company responding on behalf of Employers Insurance Company of Wausau.*

**ZURN, Vice Chancellor.**

This case has taken over three years to tee up a single question: whether a dissolved and cancelled limited liability company's certificate of cancellation should be nullified due to the company's allegedly improper dissolution. This opinion concludes the petitioner has failed to prove that nullification is warranted.

The petitioner here is a plaintiff in an asbestos action brought against the company. She turned to this Court to appoint a receiver over the company and nullify its certificate of cancellation, alleging the company's dissolution and cancellation violated Sections 18-203 and 18-804 of Delaware's Limited Liability Company Act. She alleges the company still had assets when it dissolved, that it failed to set aside those assets to provide for claimants, and that its dissolution and cancellation were bad faith maneuvers to avoid liability on known claims.

Earlier in the case, I found the petitioner had demonstrated good cause to appoint a receiver over the company for the limited purpose of investigating whether the company had assets when it filed its notice of dissolution and cancellation. I deferred ruling on nullification until the receiver submitted a report on that question. A receiver was appointed, and the case marched on.

The receiver determined the company had three types of assets when it dissolved: unexhausted insurance policies, litigable insurance coverage claims, and litigable breach of fiduciary duty and aiding and abetting claims. But for contingent rights like insurance coverage and litigable claims to constitute assets for purposes

1

of Section 18-804, they must be able to provide reasonable compensation for claimants.

I conclude the insurance policies the receiver identified are not company assets for purposes of Section 18-804 because they do not afford the company any coverage. The petitioner failed to prove two of the policies exist. For others, the petitioner failed to prove the company had acquired rights to coverage under the policies. For still others, the petitioner failed to prove the policies would be able to compensate for pending or likely claims.

I also conclude the litigable claims the receiver identified do not constitute assets of the company because they offer no value. A certificate of cancellation will not be nullified based on hypothetical litigable claims that would yield no reasonable recovery. The claims at issue here are largely exculpated by the company's operating agreement or otherwise not viable.

The petitioner failed to prove the company violated the Limited Liability Company Act by filing a certificate of cancellation without setting assets aside for claimants. The petitioner has thus failed to secure a nullification of that certificate.

## I. BACKGROUND[1]

Reinz Wisconsin Gasket, LLC ("RWG" or the "Company") is a Delaware limited liability company that dissolved and was cancelled in August 2022.[2] Nine months before its dissolution, petitioner Linda A. Cook ("Petitioner") had sued the Company for products liability in the United States District Court for the District of Massachusetts (the "Massachusetts Action").[3] Then Petitioner came to Delaware and filed this action seeking nullification of RWG's certificate of cancellation, claiming RWG's dissolution violated Sections 18-203 and 18-804 of Delaware's Limited Liability Company Act (the "LLC Act"). She alleges RWG had assets, including unexhausted insurance policies and litigable claims, that it failed to set aside to provide for claimants when it filed its notice of dissolution and cancellation.[4]

---

[1] Citations in the form of "Trial Tr. —" refer to the trial transcript, available at docket item ("D.I.") 70. Citations in the form of "Hr'g Tr. —" refer to the transcript for the oral argument on Petitioner's Motion to Nullify Cancellation of Reinz Wisconsin Gasket, LLC and Request to Expand Receiver's Authority, available at D.I. 271. Citations in the form "JX —" refer to the parties' joint trial exhibits. D.I. 64. Citations in the form "RX —" refer to the exhibits to the receiver's final report, available at D.I. 218; D.I. 219; D.I. 220; D.I. 221; D.I. 222; D.I. 223; D.I. 224; D.I. 225; D.I. 226. Citations in the form "PTO —" refer to the parties' stipulated pre-trial order, available at D.I. 55.

[2] JX 153; JX 156.

[3] JX 93 ¶¶ 66, 69; JX 121. Petitioner reached a settlement with certain defendants in the Massachusetts Action, including intervenor DCo, LLC. D.I. 256, Transmittal Affidavit of Mari Boyle, Esq. in Support of DCo LLC's Brief in Opposition to Petitioner's Motion to Nullify Cancellation of Reinz Wisconsin Gasket, LLC and Request to Expand Receiver's Authority [hereinafter "Boyle Aff."], at Ex. 3. One defendant went to trial and obtained a defense verdict on September 28, 2023. Boyle Aff. Ex. 4. The case has been inactive since October 3, 2023. Boyle Aff. Ex. 5.

[4] D.I. 1 [hereinafter "Pet."].

RWG's corporate history informs what assets, if anything, remained in its name when RWG dissolved. That history begins with Wisconsin Gasket & Manufacturing Co. ("WG&M"), a Wisconsin corporation established in 1943 and incorporated in 1944.[5] WG&M was established to manufacture and supply gaskets to Milwaukee's war plants.[6] Petitioner's late husband, Roland Cook, was allegedly exposed to asbestos when he worked with gaskets made by RWG and other manufacturers from 1964 through 1968, and again from 1976 through 1989.[7]

## A. WG&M's Insurance Coverage

WG&M had insurance coverage for asbestos-related personal injury liability under four sets of policies: (1) comprehensive general liability policies issued by Employers Mutual Liability Insurance Company of Wisconsin, an affiliate of intervenor Employers Insurance Company of Wausau ("Wausau");[8] (2) comprehensive general liability and umbrella policies issued by the Kemper Insurance Companies ("Kemper"), which would later do business as Lumbermens

---

[5] JX 193 ("In 1943 a manufacturing company was created to supply gaskets to the production lines of Milwaukee's war plants."); JX 107; JX 1 (reflecting WG&M filed its articles of incorporation with the Wisconsin Department of State on December 28, 1944).

[6] JX 193.

[7] JX 93 ¶¶ 65–66.

[8] RX 73; RX 74; RX 75; RX 76; RX 77; RX 78; RX 79; RX 80; RX 81; RX 82; RX 83; RX 84; RX 85; RX 86; RX 87; D.I. 253, Affidavit of Annette Fochs in Support of Employers Insurance Company of Wausau's Response in Opposition to Petitioner's Motion to Nullify [hereinafter "Fochs Aff."], at Ex. C; Fochs Aff. Ex. D.

Mutual Casualty Company and American Manufacturers Mutual Insurance Company (collectively, "Lumbermens");[9] (3) an excess policy issued by Continental Casualty Company ("Continental");[10] and (4) umbrella policies issued by Aetna Casualty & Surety Company, later called Travelers Casualty & Surety Company ("Travelers").[11] WG&M was the named insured on each of these policies.

WG&M was insured under seventeen Wausau policies covering successive, roughly one-year policy periods between 1944 and 1959.[12] The policies require Wausau to indemnify WG&M for personal injury liability caused by an "occurrence," defined as "either an accident or a continuous or repeated exposure to

---

[9] JX 2; JX 3; JX 4. The record does not contain copies of the comprehensive general liability policies issued by Lumbermens to WG&M.

[10] RX 88.

[11] RX 89; RX 90; RX 91.

[12] RX 73 (covering a policy period from April 17, 1944 through May 1, 1945); RX 74 (covering a policy period from May 1, 1947 through May 1, 1948); RX 75 (covering a policy period from May 1, 1948 through May 1, 1949); RX 76 (covering a policy period from May 1, 1949 through May 1, 1950); RX 77 (covering a policy period from May 1, 1950 through May 1, 1950); RX 78 (covering a policy period from May 1, 1951 through May 1, 1952); RX 79 (covering a policy period from May 1, 1952 through May 1, 1953); RX 80 (covering a policy period from May 1, 1953 through May 1, 1954); RX 81 (covering a policy period from May 1, 1954 through May 1, 1955); RX 82 (covering a policy period from May 1, 1955 through July 8, 1955); RX 83 (covering a policy period from July 8, 1955 through May 1, 1956); RX 84 (covering a policy period from May 1, 1956 through May 1, 1957); RX 85 (covering a policy period from May 1, 1957 through May 1, 1958); RX 86 (covering a policy period from May 1, 1958 through May 1, 1959); RX 87 (covering a policy period from May 1, 1959 through May 1, 1960); Fochs Aff. Ex. C (covering a policy period from May 1, 1945 through May 1, 1946); Fochs Aff. Ex. D (covering a policy period from May 1, 1946 through May 1, 1947).

any condition resulting in injury during the policy period."[13] Later-discovered injury caused by asbestos exposure during a particular policy period falls within the scope of the policy.

WG&M had additional coverage in excess and umbrella policies. The Continental excess policy has a policy period running from November 22, 1977 through September 20, 1978.[14] It provides $4,000,000 in excess coverage for "the amount of loss which is in excess of the applicable limits of liability of the underlying insurance."[15] The schedule of underlying insurance lists two policies applicable to asbestos-related personal injury liability, both issued by Lumbermens: a comprehensive general liability policy with a $500,000 liability limit, and an umbrella policy with a $1,000,000 liability limit.[16] So $1,500,000 must be exhausted before the Continental policy's excess coverage attaches.

WG&M's three umbrella policies from Travelers cover successive, one-year policy periods between December 1978 and December 1981.[17] These policies provide $5,000,000 in excess coverage "for ultimate net loss in excess of the

---

[13] *E.g.*, RX 84 at 4.

[14] RX 88 at 1.

[15] *Id.* at 2.

[16] *Id.* at 6.

[17] RX 89 (covering a policy period from December 5, 1978 through December 5, 1979); RX 90 (covering a policy period from December 5, 1979 through December 5, 1980); RX 91 (covering a policy period from December 5, 1980 through December 5, 1981).

applicable underlying limit."[18] Each policy identifies an underlying comprehensive general liability policy issued by Lumbermens with a $500,000 liability limit.[19] So $500,000 must be exhausted for each policy before coverage attaches.

## B. WG&M Sells Its Assets To The Reinz Corporate Family.

In May 1981, WG&M entered into an agreement (the "Purchase Agreement") to sell its assets to a Delaware subsidiary ("Wisconsin Gasket DE") of Reinz Dichtungs GmbH, a German entity (the "Asset Sale").[20] Reinz Dichtungs GmbH owned several gasket manufacturing companies and facilities around the world.[21] Wisconsin Gasket DE would be called WG&M after the Asset Sale, but to distinguish it from the seller, I will still call the buyer Wisconsin Gasket DE.[22]

The Purchase Agreement contemplated the transfer of all of WG&M's assets, but only three narrowly defined categories of liabilities.[23] WG&M represented that it had disclosed all its insurance policies on an Exhibit G, and that all such policies would be transferred to Wisconsin Gasket DE at closing.[24] Exhibit G is not part of

---

[18] RX 89 § 2.1; RX 90 § 2.1; RX 91 § 2.1.

[19] RX 89 at RWG_TRAV000101; RX 90 at RWG_TRAV000087; RX 91 at RWG_TRAV000132.

[20] JX 6; JX 7 [hereinafter "Purchase Agreement"]; JX 193.

[21] *See* RX 21; JX 9 at 2–3.

[22] *See* Purchase Agreement § 8.3.

[23] *Id.* §§ 1.1, 2.2.

[24] *Id.* § 6.1(g).

the record.[25]   To effectuate the Asset Sale, including the transfer of WG&M's insurance rights, the Purchase Agreement required WG&M to deliver "deeds, bills of sale, endorsements, assignments, and other good and sufficient instruments of conveyance and transfer" at closing.[26]

After the Asset Sale, WG&M changed its name to Gerschke & Erdman Ltd.[27] Pursuant to a noncompetition agreement the Purchase Agreement required, Gerschke & Erdman Ltd. stopped making gaskets.[28]  It held only the proceeds from the Asset Sale, and its only purpose was to invest those proceeds.[29]  A month after the Asset Sale, Gerschke & Erdman Ltd. merged with and into a Delaware corporation of the same name.[30]  Gerschke & Edman Ltd. changed its name to G & G of Delaware Ltd. in 2004, and dissolved in 2019.[31]

---

[25] D.I. 217 [hereinafter "Report"] at 32 ("Receiver has been unable to locate a copy of Exhibit G."); JX 178 [hereinafter "Stringham Tr."] at 81–82; JX 182 [hereinafter "Wawrzyniak Tr."] at 50.

[26] Purchase Agreement § 1.2(a).

[27] RX 18 at 1, 24–25.

[28] Purchase Agreement § 10.1(g); RX 23 ¶ 10.

[29] RX 23 ¶ 10.

[30] RX 18 at 26.

[31] RX 23 ¶¶ 14–17.

Wisconsin Gasket DE, on the other hand, continued its gasket manufacturing operations. In January 1985, it changed its name to Reinz Wisconsin Gasket Company ("RWG Co.").[32]

From 1981 through 1991, Wisconsin Gasket DE and RWG Co. had insurance coverage for asbestos-related personal injury liability under two sets of policies: (1) comprehensive general liability and excess policies issued by Lumbermens,[33] and (2) umbrella policies issued by Travelers.[34] Each of the Travelers umbrella policies lists an underlying comprehensive general liability policy issued by Lumbermens with a $500,000 liability limit.[35] So $500,000 must be exhausted for each policy before coverage attaches.

---

[32] JX 16; JX 28 at 2; JX 193.

[33] JX 11 (primary policy covering a policy period from September 1, 1982 through September 1, 1984); JX 15 (primary policy covering a policy period from September 1, 1984 through September 1, 1987); JX 17 (primary policy covering a policy period from September 1, 1986 through September 1, 1987); JX 19 (primary policy covering a policy period from September 1, 1987 through September 1, 1988); JX 20 (primary policy covering a policy period from September 1, 1988 through September 1, 1989); JX 21 (primary policy covering a policy period from September 1, 1989 through September 1, 1990); JX 22 (primary policy covering a policy period from September 1, 1990 through September 1, 1991); JX 18 (excess policy covering a policy period from September 1, 1986 through September 1, 1987).

[34] RX 92 (umbrella policy covering a policy period from December 5, 1982 through December 5, 1983); RX 93 (umbrella policy covering a policy period from December 5, 1983 through February 1, 1984).

[35] RX 92 at RWG_TRAV000072; RX 93 at RWG_TRAV000115.

The record is silent as to RWG Co.'s insurance coverage for asbestos-related personal injury liability after 1991.

### C. Dana Corp. Acquires RWG Co.

In August 1993, Dana Beteiligungs GmbH acquired RWG Co.'s parent company, Reinz Dichtungs GmbH.[36]  Then the acquirer's parent company, Dana Corporation ("Dana Corp.") acquired Reinz Dichtungs GmbH's interest in RWG Co., making RWG Co. a Dana Corp. subsidiary.[37]

In December 2005, Dana Corp. incorporated RWG as a new wholly owned subsidiary.[38]  In January 2006, RWG Co. merged with and into RWG, with RWG surviving as a Dana Corp. subsidiary.[39]  RWG's initial operating agreement provided that its "sole Member is Dana Corp[.]"[40]

### D. Dana Corp. And RWG File For Chapter 11 Bankruptcy And Undergo A Restructuring.

In March 2006, Dana Corp. and its subsidiaries, including RWG, filed for Chapter 11 bankruptcy.[41]  RWG filed a list of its known assets in schedules.[42]

---

[36] JX 25; JX 26.

[37] JX 26 ("Reinz [Dichtungs GmbH] sells and conveys to Dana [Corp.] all of its right, title, and interest in and to" the "outstanding share capital of RWG.").

[38] JX 29; JX 30.

[39] JX 31.

[40] JX 30 § 2(A) (RWG's initial operating agreement dated December 22, 2005).

[41] JX 32; JX 40 at RESP0002103.

[42] JX 33.

Schedule B asked RWG as the debtor to list "[i]nterest in insurance policies" and "[n]ame [the] insurance company of [each] policy and itemize surrender or refund value of each."[43] For "Description and Location of Property," RWG listed "See Exhibits B-9a and B-9b immediately following Schedule B."[44] For "Net Book Value of Debtor's Interest in Property, Without Deducting Any Secured Claim or Exemption," RWG listed "$47,936."[45] On Exhibit B-9a, for "Description," RWG listed "Prepaid Insurance," and under "Net Book Value," RWG listed "$47,936."[46] In a footnote, RWG stated: "In addition to the insurance policies listed on this Schedule, the Debtor may have rights to coverage under certain other insurance policies listed in Schedule G for this Debtor."[47] Exhibit B-9a does not list or attach

---

[43] *Id.* at RESP0000216 (capitalization altered).

[44] *Id.* (capitalization altered).

[45] *Id.* (capitalization altered).

[46] *Id.* at RESP0000220 (capitalization altered).

[47] *Id.*

11

a list of policies. Exhibit B-9b does not exist.[48] Schedule G does not include insurance policies.[49]

In December 2007, the bankruptcy court confirmed the Third Amended Joint Plan of Reorganization of Dana Corp. and its subsidiaries, including RWG (the "Reorganization Plan").[50] The Reorganization Plan went into effect on January 31, 2008.[51]

Pursuant to the Reorganization Plan, Dana Corp. undertook a series of restructuring transactions "to streamline [its] corporate structure."[52] As part of the restructuring, Dana Corp. merged into a new subsidiary named Dana Companies, LLC ("DCo"), and RWG became a DCo subsidiary.[53] RWG then transferred all of its operating assets and real estate to a separate Dana Corp. subsidiary created to

---

[48] I wrote to the parties asking them to submit any attachments or other exhibits to Schedule B or certify that they do not exist. D.I. 69. The parties responded in separate letters certifying that the requested documents do not exist. D.I. 71; D.I. 72. Schedule B and its exhibits were prepared by counsel not involved in this action. According to intervenor DCo LLC's counsel, Schedule B's instruction to list only "[i]nterests in insurance policies" with a "surrender or refund value" suggests RWG "had no reason to include on its Schedule B any information about expired insurance policies, including policies issued in the 1980s by Lumbermens." D.I. 71.

[49] JX 33 at RESP0000250.

[50] JX 40 at RESP00002013–14.

[51] JX 43 at RESP0002185; JX 37.

[52] JX 40 at RESP0002040.

[53] RX 34. In February 2018, Dana Companies, LLC changed its name to DCo LLC. *See* JX 59. This opinion refers to both Dana Companies, LLC and DCo LLC as "DCo."

house some of Dana Corp.'s active administrative operations.[54] The bankruptcy court recognized RWG would be "solvent . . . for the foreseeable future" even after that transfer.[55] The Reorganization Plan instructed Dana Corp. to "dissolve, liquidate, or merge inactive entities that no longer serve an ongoing business purpose."[56]

In 2014, DCo executed RWG's most recent operating agreement (the "Operating Agreement").[57] The Operating Agreement designates DCo as RWG's sole member.[58] And it provides that RWG may dissolve at DCo's election.[59]

---

[54] JX 41 § 1.4 (describing the "Contributed Assets" as including RWG's "right, title and interest in and to any and all assets, property, rights and claims of every kind, character, and description . . . that is owned or used by [RWG] in connection with, or relating to, the conduct of the business of [RWG] at the plants, offices and other facilities and locations set forth opposite [RWG's] name in the column labeled 'Transferred Facilities' on Annex A"); JX 41 at Annex A (describing the "Transferred Facilities" as the "Milwaukee, WI (plant and warehouse lease)"); JX 44 (warranty deed conveying RWG's real estate to Dana Sealing Products, LLC); JX 82 at RESPRESP0003399 ("Pursuant to Dana Bankruptcy Plan, Reinz Wisconsin Gasket, LLC transferred all operating assets to Dana Sealing Products, LLC."); Trial Tr. 66, 109.

[55] JX 40 at RESP0002041.

[56] RX 34 at 2.

[57] JX 46.

[58] *Id.* § 2(A) ("The sole Member is Dana Companies, LLC"); PTO ¶ 5 ("DCo LLC was the sole member of [RWG] before [RWG's] cancellation").

[59] JX 46 §§ 5–(A) ("[T]he Company shall be dissolved upon . . . [t]he election of the Member to dissolve and terminate the Company.").

13

## E.   An Insurance Arbitrageur Acquires RWG.

In December 2016, Enstar Holdings (US) Inc. ("Holdings") acquired DCo, and in turn, RWG.[60]  Holdings is a subsidiary of Enstar Group Limited ("Enstar"), which "acquire[s] (re)insurance companies and legacy manufacturing companies with direct exposure to asbestos and environmental liabilities . . . , which are either in run-off or can be placed into run-off following [an] acquisition."[61]  It "receive[s] investment returns from the investment of the assets acquired with these companies, which [Enstar] use[s] to settle the liabilities acquired and may take many years to complete."[62]

Following the acquisition, DCo entered into an administrative services agreement with Holdings' subsidiary Enstar (US) Inc. ("EUSI").[63]   Under that agreement, DCo would pay EUSI for administrative, legal, insurance-related, and other services.[64]

---

[60] JX 52; JX 54 at RESP0002449–50; JX 49 at ENT000089.  DCo remained RWG's sole member following the acquisition.  *See* PTO ¶ 5.

[61] JX 114 at RESP0002479; JX 54 at RESP0002198 ("Enstar acquires and manages insurance and reinsurance companies and portfolios of insurance and reinsurance business in run-off.").

[62] JX 114 at RESP0002479.

[63] JX 53.  The Report mistakenly states that EUSI is the "parent company of DCo and, in turn, RWG."  Report at App'x A.  DCo's parent company is Holdings, not EUSI.  *See* JX 54 at RESP0002449.

[64] JX 53.

### F. DCo And EUSI Investigate RWG's Insurance Coverage.

In October 2020, RWG was named a defendant in its first asbestos lawsuit.[65] Another followed in January 2021.[66] So RWG began investigating its historical and present insurance coverage for the period of the plaintiffs' alleged exposure.

In February 2021, RWG's Vice President Vicki Stringham wrote to a Dana Incorporated director that "plaintiffs' counsel have been delving deep into discovery responses," and that "[t]heir newest target is Reinz Wisconsin Gasket LLC."[67] In that email, she asked: "Dana purchased the RWG stock from the German entity Reinz Dichtungs, GmbH. Technically, we should have access to the insurance policies. You don't happen to know of any such policies?"[68] The director responded that he could not find anything.[69]

---

[65] JX 65. The action was initially filed in November 2017 in the Superior Court for the Commonwealth of Massachusetts. *See* JX 56; *see also* JX 144 at RESP0007443 ("The first lawsuit against RWG was filed in November 2017."). The plaintiff's fourth amended complaint named RWG as a defendant and alleged that exposure to asbestos and asbestos-containing products manufactured by the defendants from 1978 to 2003 caused her decedent's mesothelioma and death. JX 65 ¶ 8–10.

[66] *See* Report at App'x C. The Report states that "[a]t the time RWG dissolved, it had been named in approximately fifty lawsuits alleging asbestos exposure and liability from the 1960s through the 2000s." Report at 51 & App'x C. That statement is misleading. Of the fifty-four lawsuits identified in Appendix C, most were brought against RWG's predecessors, not RWG. And five were brought after RWG's dissolution. *See* Boyle Aff. Ex. 2.

[67] JX 72 at RESP0007590.

[68] *Id.*

[69] *Id.* at RESP0007589.

A few months later, Stringham found "notice letters" to Continental, "and potentially a policy number" while cleaning out an office.[70] The next month, DCo, on RWG's behalf, engaged an insurance archivist to locate and identify RWG's historical insurance coverage.[71] In September, DCo gave the insurance archivist documents it had related to the Continental policies to aid his search.[72]

In October, the archivist sent a status update to DCo and EUSI.[73] The archivist reported that he had contacted Wisconsin Gasket DE's insurance broker, Stanley B. Strelka.[74] Strelka gave the archivist leads on workers' compensation policies, Lumbermens policies dating back to 1960, and names of other contacts who might have more information.[75]

In December, the archivist emailed another status update on his research efforts.[76] That update presented a "good news/bad news situation[]."[77] The good

---

[70] JX 75 at RESP0004292; Stringham Tr. 83–84.

[71] JX 76; Wawrzyniak Tr. 28–29; Stringham Tr. 83.

[72] JX 82 at RESP0003398–3413.

[73] JX 85 at RESP0007602.

[74] JX 88 at RESP0002725 ("Stanley Strelka of Professional Insurance Services, the company's insurance broker through the mid to late 1980s, recently confirmed the lengthy relationship with Kemper Insurance."); JX 8 at RESP0003401; JX 13 at RESP0003406–07, RESP0003410; JX 85 at RESP0007602–03.

[75] JX 85 at RESP0007602–03.

[76] JX 94 at RESP0003414.

[77] *Id.*

news was that the "Lumbermens Liquidator" had located and provided archival copies of "Lumbermens/Kemper" policies "from the critical years of interest."[78]

The bad news was that the investigation had seemingly reached "a crossroads" from there.[79] Lumbermens and its affiliates had entered liquidation in 2013.[80] The claims deadline was November 10, 2014.[81] RWG did not file any claims before that deadline because, according to DCo, there were no pending claims against RWG at the time.[82] The archivist cautioned that "given the status of [Lumbermens] in liquidation, the likely benefit [of the located policies] is much harder to determine."[83]

The archivist thus suggested digging into "who the reinsurer was for these policies."[84] But he noted that while "[the Lumbermens] policies all clearly show

---

[78] *Id.*; *see* JX 2 (umbrella Lumbermens policy covering September 20, 1968 through September 20, 1971); JX 3 (umbrella Lumbermens policy covering September 20, 1971 through September 20, 1974); JX 4 (umbrella Lumbermens policy covering September 20, 1974 through September 20, 1977); JX 5 (workers compensation Lumbermens policy covering May 1, 1978 through May 1, 1979).

[79] JX 94 at RESP0003414–15.

[80] JX 45; JX 144 at RESP0007443.

[81] JX 58 at RESP0003125.

[82] Stringham Tr. 168 ("Q. All right. And did Reinz Wisconsin from emergence from bankruptcy up through 2014, did Reinz Wisconsin Gasket have any claims that it could have submitted to the insolvency for, or whatever it was, in Illinois? A. No, we did not.").

[83] JX 94 at RESP0003414.

[84] *Id.*

that they were subject to facultative reinsurance,"[85] he believed "it is much more likely than not that there was not direct privity or a third party beneficiary relationship with Hannover or some other reinsurer."[86] And he reported that his efforts to contact a potential lead—a "German attorney who [RWG's] broker indicated had facilitated the reinsurance between Lumbermens and Hannover"— were unsuccessful.[87] Because he did not hear back from the German attorney, the archivist suggested looking into potential "excess coverage over and above the Lumbermens policies," and contacting Reinz Dichtungs GmbH.[88] Those leads, too, seemed unpromising.[89]

---

[85] *See Brit. Ins. Co. of Cayman v. Safety Nat. Cas.*, 335 F.3d 205, 212 n.4 (3d Cir. 2003) ("There are two types of reinsurance – facultative and treaty. 'Facultative reinsurance covers only a particular risk or a portion of it, which the reinsurer is free to accept or not.' 'Treaty insurance obligates the reinsurer to accept in advance a portion of certain types of risks that the ceding insurance company underwrites.'" (citations omitted) (citing and quoting *Christiania Gen. Ins. Corp. of New York v. Great Am. Ins. Co.*, 979 F.2d 268, 271 (2d Cir. 1992))).

[86] JX 94 at RESP0003414.

[87] *Id.*

[88] *Id.* at RESP0003414–15; *see also* Trial Tr. 47–48.

[89] JX 94 at RESP0003415 ("From a quick glance at the attached policies, it appears that Lumbermens was actually writing its general liability coverage in two layers . . . . Perhaps there were additional excess layers, but that seems inconsistent with the former broker's recollection."); *see also id.* ("Alternatively, perhaps Reinz Dichtungs [GmbH] included Wisconsin Gasket [DE]/ [RWG] on its program through its own excess layers. If so, it seems we would have to go through Reinz Dichtungs [GmbH] to obtain that information. As I recall, we were not particularly optimistic that Reinz [Dichtungs GmbH] would be willing to provide us assistance in locating that type of information.").

The archivist's status update belied growing pessimism about the investigation. He reported that based on his investigation, "it appears that all of the relevant general liability coverage would have been issued by Lumbermens and/or its affiliates."[90] And he noted that "[w]ith the new information we have, I feel like we may be reaching the point where the likely return on investment starts to look less optimistic."[91] EUSI responded to the update in January 2022, and set up a call between EUSI, DCo, and the archivist at the end of the month.[92]

By that point, EUSI and DCo believed the archivist had "taken [the investigation] as far as [he could]."[93] After the archivist sent his invoice on February 11, DCo and EUSI emailed back and forth, with DCo asking "[a]re we done with this investigation? I do not have additional money budgeted for [the archivist]" and "[h]ave you called off [the archivist]? He seems the type to keep looking."[94] On February 14, EUSI told the archivist to "please stand down with any other work."[95]

---

[90] *Id.* at RESP0003414.

[91] *Id.*

[92] JX 105.

[93] JX 104 at RESP0007932.

[94] JX 104.

[95] JX 105 at RESP0007934.

## G. RWG Dissolves.

Having failed to locate any other insurance policies, DCo determined dissolution was RWG's best course. On August 25, 2022, EUSI kicked off a closing diligence process. EUSI's legal counsel asked various individuals to confirm whether RWG had any "real property or leases,"[96] "outstanding loans payable or receivable" or "open bank accounts,"[97] unpaid taxes,[98] "regulatory licenses" or "intellectual property,"[99] "employees,"[100] "outstanding accounts receivable," "creditors (suppliers, lenders, service providers, utilities, etc.)," or "assets."[101] Each representative responded in the negative.[102]

The same day, DCo called a special meeting for August 29 to "discuss the dissolution of Reinz Wisconsin Gasket LLC."[103] At the meeting, DCo presented a

---

[96] JX 137.

[97] JX 138.

[98] JX 139.

[99] JX 140.

[100] JX 141.

[101] JX 146.

[102] *See* JX 137 ("I am not aware of any leases or real property for this entity."); JX 138 ("There are no loans payable or receivable."); *id.* ("I can confirm that there are no open bank accounts."); JX 139 ("The company has filed and paid all taxes to date."); JX 140 ("I am not aware of either [regulatory licenses or intellectual property]."); JX 141 ("There are no employees."); JX 146 (responding "[n]o to all questions below" to inquiry about any outstanding accounts receivables, creditors, or assets"); *see also* JX 154 (RWG's closing checklist).

[103] JX 136.

"Wind Up Plan" for the Company.[104]  The presentation included "background"
information about RWG and three possible options DCo could pursue in connection
with RWG's windup.[105]  The slide titled "Reinz Wisconsin Gasket LLC
Background"  included bullet points such as:

- "RW[G] lacks insurance (following the liquidation of Lumbermens Mutual Casualty Company) and has no assets."[106]
- "At the time of the bankruptcy, RWG was not capitalized."[107]
- "RWG currently has 6 cases pending against it."[108]
- "Lumbermens Mutual Casualty Company is the sole insurance provider and was placed in liquidation by an Illinois court in 2013."[109]
- "No indemnity has been paid in any RWG case."[110]

A slide titled "Future Wind-Up Plan" included a bullet point stating "Confirmed lack
of assets or insurance available."[111]  The next day, on August 30, RWG filed its
notice of dissolution and cancellation.[112]

---

[104] JX 144 at RESP0007442–43, RESP0007448.

[105] JX 144.

[106] *Id.* at RESP0007443.

[107] *Id.*

[108] *Id.*

[109] *Id.*

[110] *Id.*

[111] *Id.* at RESP0007448.

[112] JX 153; JX 156.

**H.   Petitioner Files Suit In Massachusetts, Then Turns To This Court.**

On August 19, 2021, Petitioner filed suit in the United States District Court for the District Court of Massachusetts, against twenty-nine defendants whose products allegedly contributed to her husband's mesothelioma and death.[113] The original action did not name RWG as one of those defendants.[114]

On November 17, Petitioner moved to amend her complaint to add RWG as a defendant and to seek damages for her husband's exposure to asbestos-containing products while working part-time for repair shops from 1976 through 1989.[115] That motion was granted.[116] On December 2, Petitioner filed an amended complaint naming RWG as a defendant.[117]

On July 27, 2022, Petitioner served RWG with a notice of deposition to cover topics including the assets and insurance available to satisfy any judgment in that action.[118] On August 30, RWG's counsel in the Massachusetts Action indicated that

---

[113] JX 77.  Petitioner's husband died on March 27, 2022, during the pendency of the Massachusetts Action.  JX 77; JX 93; JX 108.

[114] JX 77.

[115] JX 90.

[116] JX 93.

[117] *Id.*

[118] JX 123.

RWG intended to produce a Rule 30(b)(6) witness.[119]  By September 1, RWG's counsel indicated it would not.[120]

Petitioner then turned to this Court.  On September 23, 2022, Petitioner filed a Verified Petition for Appointment of a Receiver in Dissolution Pursuant to 6 *Del. C.* § 18-805 (the "Petition") individually and as Executor of the Estate of Roland Cook.[121]  The Petition sought to appoint a receiver to determine if RWG holds any insurance policies or assets available to satisfy a damages award in the Massachusetts Action, find RWG's dissolution improper, and void RWG's certificate of cancellation.  Count I seeks nullification of RWG's certificate of cancellation on the grounds that RWG failed to comply with Sections 18-203 and 18-804 of the LLC Act when dissolving.[122]  Count II seeks the appointment of a receiver under Section 18-805 on the grounds that RWG did "not complete[] its

---

[119] JX 142 at 2 (emailing on August 26, 2022: "I apologize for the delayed response, the client and NCC have been working to determine who the appropriate witness is for this deposition.  I will provide you with a date for this deposition either later today, or Monday, August 29, 2022, at the latest."); JX 152 at 2 (emailing on August 30, 2022: "The witness is Vicki Stringham. We will have a date for you by tomorrow."). Vicki Stringham is Vice President, Assistant Secretary, and a director of RWG's sole member DCo.  PTO ¶¶ 14–16.  She also was a director of RWG until October 2021. *Id.* ¶ 18.

[120] Plaintiff's Motion to Compel Defendant Reinz Wisconsin Gasket LLC's Rule 30(b)(6) Deposition and Motion for Sanctions, *Linda A. Cook, Individually and as successor for the Estate of Roland Cook v. Foster Wheeler Energy Corp.*, C.A. No. 1:21-cv-11362-RWZ (D. Mass. Sept. 2, 2022), ECF No. 326, at 5–6 (describing a phone call between counsel). I may take judicial notice of this filing under Delaware Rule of Evidence 202(d)(1)(C).

[121] *See generally* Pet.

[122] *Id.* ¶¶ 16–18.

winding up process in accordance with applicable law."[123]   Petitioner perfected

service by publication, as required for a cancelled entity.[124]   Delaware counsel

entered their appearance "for Respondent Reinz Wisconsin Gasket LLC" on October

19.[125]  On October 28, "Respondent Reinz Wisconsin Gasket, LLC" filed an answer

to the Petition.[126]

The request to appoint a receiver was tried on a paper record on December 19,

2022.[127]  The trial record includes over 600 joint exhibits.[128]  On March 20, 2023, I

issued a post-trial opinion (the "Post-Trial Opinion") concluding Petitioner had

demonstrated good cause to appoint a receiver under Section 18-805.[129]  As in *In re*

*Texas Eastern Overseas, Inc.*, the Post-Trial Opinion framed Section 18-805's good

cause inquiry as whether Petitioner had "provided sufficient grounds for the Court

to conclude that it is reasonably likely [the respondent] continues to hold

undistributed assets."[130]   Guided by that evidentiary standard, and on the record

---

[123] *Id.* ¶ 22.

[124] D.I. 5; *In re VBR Agency, LLC*, 274 A.3d 1068, 1076 (Del. Ch. 2022).

[125] D.I. 10.

[126] D.I. 14.

[127] D.I. 66; Trial Tr.

[128] D.I. 66.

[129] *In re Reinz Wis. Gasket, LLC*, 2023 WL 2568326, at *1 (Del. Ch. Mar. 20, 2023) [hereinafter "Post-Trial Op."].

[130] *Id.* at *5 (quoting 2009 WL 4270799, at *4 (Del. Ch. No. 30, 2009), *aff'd*, 998 A.2d 852 (Del. 2010)).

before me at the time, I determined it was reasonably likely RWG had assets in the form of unexhausted insurance policies when it dissolved.[131] Those policies include "unidentified prepaid insurance policies, the Aetna [workers' compensation] policies, and the [Continental] policies."[132]

The Post-Trial Opinion "stop[ped] at the appointment of a receiver."[133] It did not reach the question of whether to nullify RWG's certificate of cancellation, noting that nullification would require proof of a statutory violation by a higher evidentiary standard.[134] I deferred ruling on Count I until the receiver, tasked with investigating the existence of assets, submitted a report:

> To nullify RWG's certificate of cancellation, Petitioner would have to prove [a] statutory violation not just under a reasonable likelihood standard, but by a preponderance of the evidence. As the Court has stated in a similar context, "[a]lthough grounds may also exist for nullification of [the company's] certificate of cancellation, the appointment of a receiver under § 1[8]-805 provides the necessary relief under the circumstances." I need not yet reach whether RWG violated Section 18-203 . . . . The receiver should [] submit a report in support of the receiver's determination, at which time I will revisit Count I. If the report and trial record supports a finding, by a preponderance of the evidence, that RWG violated Section 18-804, then its cancellation will be subject to nullification.[135]

---

[131] Post-Trial Op. at *5–12.

[132] *Id*. at *6.

[133] *Id*. at *13.

[134] *Id*.

[135] *Id*. (quoting *Techmer Accel Hldgs., LLC v. Amer*, 2010 WL 5564043, at *12 (Del. Ch. Dec. 29, 2010)).

On August 3, 2023, I appointed Peter D. Protopapas (the "Receiver") as receiver of and for RWG.[136] The Receiver had a limited grant of authority to investigate whether RWG had assets when it filed its notice of dissolution and cancellation, including insurance policies, litigable claims, and claims or other proceedings relating to any other assets.[137] The Receiver was also empowered to investigate "how this litigation has been funded and any claims related to the same."[138] The Receiver dug into his investigation over the next several months.

Meanwhile, on December 15, Continental filed a motion to intervene in the action,[139] which I granted on April 24, 2024.[140] On May 6, Continental filed an answer and counterclaim for declaratory judgment.[141] The counterclaim sought "a declaration of the rights and obligations, if any, of the parties under any policy issued by Continental . . . that is alleged to be an asset of RWG."[142] And on August 14, the Receiver filed a Motion to Modify the Receivership Order, seeking the authority to

---

[136] D.I. 105.

[137] *Id.*

[138] *Id.*

[139] D.I. 140.

[140] D.I. 180.

[141] D.I. 181.

[142] *Id.* ¶ 10.

marshal RWG's assets and pursue claims on its behalf.[143]  I denied that motion as premature on November 4.[144]

On March 25, 2025, the Receiver submitted his final report (the "Report").[145] The Report identified thirty-three insurance policies purportedly affording coverage to RWG at the time of its dissolution.  It further concluded RWG possesses assets in the form of litigable claims: insurance coverage claims, breach of fiduciary duty claims against RWG's officers and directors, and aiding and abetting claims against DCo and EUSI.

On April 9, Petitioner filed her Motion to Nullify Cancellation of Reinz Wisconsin Gasket, LLC and Request to Expand Receiver's Authority (the "Motion").[146]  DCo, EUSI, and Wausau (collectively with Continental, the "Intervenors") moved to intervene in the action, and I granted their motions.[147]  The parties briefed the Motion by August 5,[148] and I heard argument on the Motion on October 23.[149]

---

[143] D.I. 190.

[144] D.I. 204; D.I. 205.

[145] *See* Report.

[146] D.I. 230.

[147] D.I. 228; D.I. 242; D.I. 250; D.I. 251; D.I. 252; D.I. 254.

[148] D.I. 230 [hereinafter "Pet'r's Opening Br."]; D.I. 253 [hereinafter "Wausau Opp. Br."]; D.I. 255 [hereinafter "DCo Opp. Br."]; D.I. 257 [hereinafter "Continental Opp. Br."]; D.I. 258 [hereinafter "EUSI Opp. Br."]; D.I. 264 [hereinafter "Pet'r's Reply Br."].

[149] D.I. 270; Hr'g Tr.

## II. ANALYSIS

This memorandum opinion picks up where the Post-Trial Opinion left off. To nullify RWG's certificate of cancellation, Petitioner must prove RWG violated the LLC Act by a preponderance of the evidence.[150] If she carries that burden, I will consider her request to grant the Receiver the authority to properly wind up the Company.

"Proof by a preponderance of the evidence means proof that something is more likely than not."[151] This "means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not. By implication, the preponderance of the evidence standard also means that if the evidence is in equipoise" the party carrying the burden will lose.[152]

Petitioner has failed to meet that burden.

---

[150] *See* Post-Trial Op. at \*3; *Martin v. Med-Dev Corp.*, 2015 WL 6472597, at \*10 (Del. Ch. Oct. 27, 2015) ("'Plaintiffs have the burden of proving each element, including damages, of each of their causes of action against each Defendant by a preponderance of the evidence.'" (quoting *OptimisCorp v. Waite*, 2015 WL 5147038, at \*55 (Del. Ch. Aug. 26, 2015))). To be clear, contrary to Petitioner's position, the Post-Trial Opinion did not "already decide[] that RWG or its successors held certain [assets]" under a preponderance of the evidence standard. Pet'r's Reply Br. 7; *see* Post-Trial Op. at \*5–12 (explaining Section 18-805's good cause standard and concluding Petitioner had met that threshold).

[151] *Med-Dev Corp.*, 2015 WL 6472597, at \*10 (quoting *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at \*13 (Del. Ch. Feb. 18, 2010)).

[152] *Med-Dev Corp.*, 2015 WL 6472597, at \*10 (internal quotation marks and footnotes omitted) (quoting *Agilent Techs., Inc.*, 2010 WL 610725, at \*13, and then quoting *OptimisCorp*, 2015 WL 5147038, at \*55).

### A. Motion To Nullify

Petitioner seeks to nullify RWG's certificate of cancellation on the grounds that RWG's dissolution did not comply with Section 18-804 and Section 18-203 of the LLC Act. Section 18-804 governs the distribution of a dissolved LLC's assets. Section 18-804(b)(2) requires a dissolved LLC to "make such provision as will be reasonably likely to be sufficient to provide compensation for any" pending claims.[153] Section 18-804(b)(3) requires the LLC to do the same for foreseeable future claims "likely to arise or become known to the limited liability company within 10 years after the date of dissolution."[154]

"[T]he LLC Act provides some flexibility to those tasked with making provision for a dissolved LLC's claims and obligations."[155] Because the statute obligates dissolved LLCs to make provisions for claims only "to the extent of assets therefor,"[156] an LLC "can dissolve in compliance with the LLC Act without [making such provisions] [] if it had no assets."[157]

---

[153] 6 *Del. C.* § 18-804(b)(2).

[154] *Id.* § 18-804(b)(3).

[155] *Capone v. LDH Mgmt. Hldgs. LLC*, 2018 WL 1956282, at *8 (Del. Ch. Apr. 25, 2018) (citing Robert L. Symonds, Jr. & Matthew J. O'Toole, *Symonds & O'Toole on Delaware Limited Liability Companies* § 16.06[E][2][c][ii] (2d ed. 2016)).

[156] 6 *Del. C.* § 18-804(b).

[157] Post-Trial Op. at *3 (citing 6 *Del. C.* § 18-804); *see also Soroof Trading Dev. Co., Ltd. v. GE Fuel Cell Sys., LLC*, 842 F. Supp. 2d 502, 520 (S.D.N.Y. 2012) ("Because an LLC is obligated to make provision for claims only 'to the extent of assets available therefor,'

29

Pursuant to Section 18-203, a certificate of cancellation should only be filed "upon the dissolution and the completion of winding up of a limited liability company."[158]   If RWG had assets, it did not properly wind up before filing its certificate of cancellation.  And "[i]f an LLC is not wound up in accordance with the LLC Act, this Court 'may nullify the certificate of cancellation, which effectively revives the LLC and allows claims to be brought by and against it.'"[159]

### 1.     The Standard

The outcome of the Motion turns on whether RWG had assets it failed to set aside to compensate plaintiffs in pending or likely claims when it dissolved.  Petitioner relies on the Report's identification of unexhausted insurance policies and litigable claims.  The Intervenors contend Petitioner must additionally show those assets offer the Company value in the form of coverage or compensation for pending or likely claims.

---

GEFCS was not wound up in contravention of Delaware law when, lacking any real assets, it did not make adequate provision for Soroof's claims." (quoting 6 *Del. C.* § 18-804(b))); *Novartis Corp. v. Webvention Hldgs. LLC*, 2015 WL 6669158, at *7 (D. Md. Oct. 28, 2015) (noting that "[i]f there are insufficient assets, such claims and obligations shall be paid or provided for to the extent of assets available" (citing 6 *Del. C.* § 18-804(b))).

[158] 6 *Del. C.* § 18-203.

[159] *Capone*, 2018 WL 1956282, at *7 (quoting *Matthew v. Laudamiel*, 2012 WL 605589, at *22 n.148 (Del. Ch. Feb. 21, 2012)); *see also Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 138 (Del. Ch. 2004).

Petitioner argues her nullification claim does not and should not inspire questions of insurance coverage.[160] Citing *In re Texas Eastern Overseas, Inc.*, she asserts that "under Delaware law, '[i]t is not the function of [a] Court within a § 279 action [to appoint a receiver] to resolve any insurance coverage dispute.'"[161] That is so due to the lower good cause standard for appointing a receiver.[162] *Texas Eastern* teaches that the good cause inquiry is a narrow one: all that is required is "a problem or opportunity to be resolved or pursued, and a reasonable likelihood that some positive outcome would result."[163] *Texas Eastern* explained a proceeding for the appointment receiver "is not an efficient venue for resolving whether a receiver has any definitive claim to [an] asset" or "the merits of any [] claim against [that] asset[]."[164] I followed that lower standard when I appointed the Receiver in view of Petitioner's showing that it was reasonably likely RWG still had unexhausted insurance policies.[165]

---

[160] Pet'r's Reply Br. 14.

[161] *Id.* (quoting *Tex. E. Overseas*, 2009 WL 4270799, at *5 n.37).

[162] *See* 8 *Del. C.* § 279 (stating that the Court of Chancery may appoint a receiver over a dissolved corporation "on application of . . . any [] person who shows good cause therefor"); 6 *Del. C.* § 18-805 (stating that the Court of Chancery may appoint a receiver over a dissolved LLC "on application of . . . any [] person who shows good cause therefor").

[163] *Tex. E. Overseas*, 2009 WL 4270799, at *5 n.39.

[164] *Id.*

[165] Post-Trial Op. at *4–5.

31

But Petitioner's current ask, to nullify a certificate of cancellation, triggers a more nuanced inquiry under a higher evidentiary standard. In *In re Krafft-Murphy Co.*, our Supreme Court held that a receiver may be appointed under 8 *Del. C.* § 279, the corporate analogue to 6 *Del. C.* § 18-805, over a corporation "whose assets consist solely of unexhausted liability insurance policies."[166] "[C]ontingent contractual rights, such as unexhausted insurance policies, constitute 'property' of a dissolved corporation, so long as those rights are capable of vesting."[167] There, as here, the dissolved company faced asbestos-related personal injury claims.[168] The company's insurance policies obligated the insurers to defend the company "in suits for damages covered by the policies" and to indemnify it "against covered third party claims."[169] That coverage was unexhausted.[170] The Supreme Court observed that "[b]ecause the Corporation is exposed to asbestos-related liabilities, those policies represent significant potential indemnification value to the Corporation."[171] And it

---

[166] 82 A.3d 696, 701 (Del. 2013).

[167] *Id.* at 698; *see also Tex. E. Overseas*, 2009 WL 4270799, at *6 (appointing a receiver under 8 *Del. C.* § 279 over a dissolved corporation based on a "reasonable likelihood . . . that [the company] ha[d] undistributed assets in the form of rights under one or more insurance policies"); *cf. Addy v. Short*, 89 A.2d 136, 140 (Del. 1952) (finding that "wholly contingent" rights, such as a possibility of reverter, constitutes the "unfinished business" of a corporation).

[168] *Krafft-Murphy*, 82 A.3d at 698.

[169] *Id.* at 699.

[170] *Id.*

[171] *Id.* at 704 (citing *Addy*, 89 A.2d at 140).

concluded that "because the Corporation held those policies before it dissolved, they constitute 'property' of the Corporation within the purview of § 279."[172]

I read *Krafft-Murphy* to offer two considerations in determining whether certain contingent rights, such as insurance policies and litigable claims, constitute assets within the meaning of Section 18-804. First, the contingent rights must be "capable of vesting."[173] In *Krafft-Murphy*, the Supreme Court concluded "contingent contractual rights constitute 'property' . . . if they possibly could vest at a future time."[174] Such rights would never vest if they do not belong to the dissolved company in the first place—i.e., if the dissolved company is not an insured under the policies at issue. Second, the contingent rights should "represent significant potential indemnification value" to the company.[175] There is no reason to revive a dissolved company if its purported assets offer no indemnification value—i.e., if they cannot reasonably provide compensation for pending or likely claims. If a policy offers no possibility of recovery because RWG is not an insured or because

---

[172] *Krafft-Murphy*, 82 A.3d at 704 (citing *Addy*, 89 A.2d at 141).

[173] *Krafft-Murphy*, 82 A.3d at 698, 703, 705.

[174] *Id.* at 701. In *Krafft-Murphy*, it was undisputed the dissolved corporation was an insured under the policies at issue. Against that factual backdrop, the Supreme Court examined whether "the statutory provisions governing dissolution (*i.e.*, §§ 278–282) operate as a general statute of limitations that time-bars all third party claims against a dissolved corporation after the limitations period expires," such that the right to recover under the insurance policies on those claims "would never vest." *Id.* at 701–02.

[175] *Id.* at 704 (citing *Addy*, 89 A.2d at 140).

33

the policy does not cover the claim at issue, it does not constitute a contingent right capable of vesting that represents significant potential indemnification value.

I turn to the policies the Receiver identified to determine if any afford RWG a possibility of recovery.

### 2. Insurance Policies

The Report identifies thirty-three insurance policies issued to WG&M, Wisconsin Gasket DE, or RWG Co.[176] Petitioner has failed to prove by a preponderance of the evidence that two of those policies exist. For policies issued to WG&M before the Asset Sale, I conclude the evidence is insufficient to establish RWG's predecessor, Wisconsin Gasket DE, acquired any of the pre-Asset Sale policies by contract. And I conclude the evidence is insufficient to establish any of the post-Asset Sale policies could indemnify or defend RWG against pending or likely claims.

### a. Petitioner Failed To Prove Two Policies Exist.

Petitioner's burden of proving that the coverage rights under the insurance policies are capable of vesting includes the burden of proving those policies exist.[177]

---

[176] *See* Report at App'x D.

[177] *See Tyson Foods, Inc. v. Allstate Ins. Co.*, 2011 WL 3926195, at *7 (Del. Super. Aug. 31, 2011) ("Plaintiffs are required to demonstrate both the existence and terms of the missing policies by a preponderance of the evidence."); *Tenneco Auto. Inc. v. El Paso Corp.*, 2004 WL 3217795, at *14 (Del. Ch. Aug. 26, 2004) ("In a typical coverage case, the insured must demonstrate the existence of a policy and that the claims fall within the terms of the policy . . . .").

The Intervenors argue Petitioner failed to carry that burden for two of the policies identified in the Report: a Continental excess policy, and a Travelers umbrella policy.[178]

Petitioner and the Receiver claim RWG has insurance rights under a Continental policy covering the period from September 20, 1978 through December 5, 1978.[179] But the only evidence speaking to its existence is a series of letters between Wisconsin Gasket DE and Continental between 1982 and 1990, and an internal memo dated April 21, 1982.[180] Those communications indicate the policy's existence is unsubstantiated.

By letter to Continental dated February 23, 1982, Wisconsin Gasket DE inquired about a policy it was "unable to find": "Policy 142-74-37, which was in effect from 09/20/78 through 12/05/78."[181] Referencing that inquiry, an internal memo by a Continental claims coordinator confirmed that "[i]n checking here with our record storage in home office, they have no record of [Policy 142-74-37]."[182] It also confirmed the claims coordinator "checked with [Continental's] Milwaukee branch where this would have been written through and they have no copy of this

---

[178] *See* Continental Opp. Br. 19–21; DCo Opp. Br. 28 n.8.

[179] *See* Report at App'x D.

[180] JX 8; JX 10; JX 13 at RESP0003411.

[181] JX 8.

[182] JX 10.

particular policy in question either."[183]  No one at Wisconsin Gasket DE or Continental could find this policy.[184]

The Receiver also identifies an umbrella policy issued by Travelers, with a policy period running from December 5, 1981 through December 5, 1982.[185]  The Report does not identify its policy number, include a copy of the policy in the Receiver's exhibits, or offer any explanation as to where this policy came from.[186] Petitioner has failed to prove this umbrella policy exists, let alone that it provides any coverage for RWG.

Petitioner has failed to prove either of these alleged policies were assets of the Company when it dissolved.

### b. The Pre-Asset Sale Insurance Policies Do Not Constitute Assets of RWG.

Before the Asset Sale, WG&M had twenty-one insurance policies providing primary, excess, and umbrella coverage for asbestos-related personal injury

---

[183] *Id.*; *see also* JX 13 at RESP0003411 (August 23, 1990 letter from Continental to Wisconsin Gasket DE confirming it did not have any record of the alleged policy).

[184] The alleged policy remained unfound when Continental conducted another policy search in 2023, in response to a subpoena from the Receiver.  D.I. 257, Transmittal Affidavit of Douglas D. Herrmann in Support of Continental Casualty Company's Brief in Opposition to Petitioner's Motion to Nullify Cancellation of Reinz Wisconsin Gasket, LLC and Request to Expand Receiver's Authority, Ex. A ¶ 6.

[185] *See* Report at App'x D.

[186] *Id.* (listing "N/A" for the columns "Ex. No." and "Policy No." in connection with the alleged Travelers umbrella policy).

liability.[187]  It is undisputed RWG is not and has never been a named insured on any of the pre-Asset Sale policies.  These policies can only be RWG assets if Wisconsin Gasket DE acquired WG&M's rights to coverage in the Asset Sale.

The proper interpretation of the Purchase Agreement is a question of law.[188] The Purchase Agreement chose Wisconsin law.[189]  In Wisconsin, "contracts must be construed as they are written."[190]  "If the contract is unambiguous, [the Court's] attempt to determine the parties' intent ends with the four corners of the contract, without consideration of extrinsic evidence."[191]  "A term or provision in a contract is not ambiguous merely because it is general enough to encompass more than one interpretation; rather, [courts] seek to ascertain its meaning by looking at the intent

---

[187] *See Id.*  WG&M had additional general comprehensive liability policies issued by Lumbermens.  But given Lumbermens' liquidation in 2013, the Receiver concedes that "Lumbermens' liquidation forecloses the Lumbermens policies themselves as assets." Report at 46 n.12 (citing Post-Trial Op. at *9).

[188] *E.g.*, *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009).

[189] Purchase Agreement § 12.13 ("The terms and provisions of this Agreement shall be governed by the laws of the State of Wisconsin.").

[190] *Columbia Propane, L.P. v. Wis. Gas Co.*, 661 N.W.2d 776, 783 (Wis. 2003); *see also Briggs & Stratton Power Prods. Gp., LLC v. Generac Power Sys., Inc.*, 796 N.W.2d 234, 237 (Wis. Ct. App. 2011); *Raasch v. City of Milwaukee*, 750 N.W.2d 492, 497 (Wis. Ct. App. 2008).

[191] *Huml v. Vlazny*, 716 N.W.2d 807, 820 (Wis. 2006) (citing *Goldstein v. Lindner*, 648 N.W.2d 892, 896 (Wis. Ct. App. 2002)).

of the contracting parties."[192]  In so doing, courts will construe a contract "as a whole

in order to give each of its provisions the meaning intended by the parties."[193]

Petitioner and the Receiver lean heavily on Section 1.1, which defines the

"[a]ssets to be [s]old and [p]urchased" at closing.[194]  Section 1.1 provides:

> [WG&M] hereby agrees to sell, and at the Closing (as hereinafter
> defined) will transfer, convey, assign and deliver to [Wisconsin Gasket
> DE], and [Wisconsin Gasket DE] hereby agrees to purchase, and at the
> Closing will acquire from [WG&M], on the terms and subject to the
> conditions of this agreement all assets, properties and business of
> [WG&M] of every kind and nature, tangible and intangible,
> wheresoever located, and whether or not recorded on the books of
> [WG&M] ("Assets") which are owned by [WG&M] as the same shall
> exist on the Closing Date.[195]

Section 1.1 goes on to provide a nonexhaustive list of assets to be transferred.  That

list includes cash, inventories, real property, equipment, claims intellectual property,

and "rights under contracts, including all outstanding and unfulfilled purchase

(vendor) and sales (customer) orders, agreements with agents or consultants,

---

[192] *Columbia Propane*, 661 N.W.2d at 783 (citing *Mattheis v. Heritage Mut. Ins. Co.*, 487 N.W.2d 52, 54 (Wis. Ct. App. 1992)).

[193] *McCullough v. Brandt*, 148 N.W.2d 718, 720 (Wis. 1967) (citing *Ketay v. Gorenstein*, 53 N.W.2d 6, 7 (Wis. 1952)); *see also Maas v. Ziegler*, 492 N.W.2d 621, 624 (Wis. 1992) ("A construction which gives reasonable meaning to every provision of a contract is preferable to one leaving part of the language useless or meaningless." (citing *Stanhope v. Brown Cnty.*, 280 N.W.2d 711, 722 (Wis. 1979))).

[194] Purchase Agreement § 1.1.

[195] *Id.*

licenses, leases, labor agreements and maintenance and service agreements."[196] The

list makes no mention of insurance policies.

The Purchase Agreement mentions insurance policies for the first time in its

representations and warranties section, specifically Section 6.1(g). WG&M

represented:

> Exhibit "G" annexed hereto contains a description of all policies of insurance maintained by [WG&M] covering fire and extended coverage, comprehensive general liability, product liability and worker's compensation. No notice of termination with respect to said insurance has been sent or received by [WG&M], and [WG&M] has not received any report from any of its insurance carriers within the past year which requires any material change in its properties or operations which has not been or will not on or prior to the Closing Date be complied with. All such policies of insurance described on Exhibit "G" are transferrable to [Wisconsin Gasket DE] and at the Closing will be transferred to [Wisconsin Gasket DE].[197]

The Receiver has not located Exhibit G.[198] The Purchase Agreement offers no

evidence of what policies were transferred.

If I were to accept Section 6.1(g)'s representation as evidence that all of

WG&M's policies were listed on Exhibit G, and if I were to accept its representation

---

[196] *Id.* §§ 1.1(a)–(i).

[197] *Id.* § 6.1(g).

[198] Report at 32 ("Receiver has been unable to locate a copy of Exhibit G.").

that they were all transferrable,[199] Petitioner would still not meet her burden.

Petitioner and the Receiver contend Section 1.1 alone effectuated the transfer of

[199] Section 6.1(b) required WG&M to "obtain[] and deliver[]" consents for "agreements or leases which by their terms are not assignable by [WG&M] without the consent of the other party." Purchase Agreement § 6.1(b). Most of WG&M's policies contained an anti-assignment clause barring coverage for assignees unless the insurer consented to the assignment. *See* RX 73; RX 74; RX 75; RX 76; RX 77; RX 78; RX 79; RX 80; RX 81; RX 82; RX 83; RX 84; RX 85; RX 86; RX 87; RX 89; RX 90; RX 91; Fochs Aff. Ex. D. There is no evidence WG&M sought and obtained consent to transfer any assets that were not assignable without third-party consent. *See* Fochs Aff. ¶ 4 ("Nationwide has not located any records suggesting that [] Wausau was ever contacted regarding its consent to transfer the Wausau Policies from [WG&M] to [Wisconsin Gasket DE], as part of the 1981 asset sale from [WG&M] to Wisconsin Gasket DE. Additionally, Nationwide has not located any records indicating Wausau approved any such transfer.").

Wausau raised the anti-assignment clauses, arguing they precluded their assignment without Wausau's consent. Wausau Opp. Br. 2, 8–9. I read Wisconsin precedent to provide that anti-assignment clauses in occurrence-based policies are unenforceable as applied to post-loss assignments. In line with a majority of jurisdictions, including Delaware, Wisconsin adheres to the principle that "policies prohibiting assignments of the policy, except with the consent of the insurer, apply only to assignments before loss, and do not prevent an assignment after loss." *Pepsi-Cola Metro. Bottling Co., Inc.*, 979 NW.2d 627, 633 (Wis. Ct. App. 2022) (citation omitted); *see also In re Viking Pump, Inc.*, 148 A.3d 633, 649–52 (Del. 2016). The rationale underlying the majority rule is twofold. First, "once the insured-against loss has occurred, the policy-holder essentially is transferring a cause of action rather than a particular risk profile." *Globecon Gp., LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 171 (2d Cir. 2006). Second, when the loss occurs prior to assignment, the risk profile of the assignee is immaterial. The loss has already occurred; the insurer is simply "covering the risk it originally contracted to insure." *Viking Pump*, 148 A.3d at 651–52.

Wausau relies on *Red Arrow Products Co., Inc. v. Employers Insurance of Wausau* to argue that any purported transfer of insurance rights in the Asset Sale was barred by the anti-assignment clauses. *See* Wausau Opp. Br. 18 (citing 607 N.W.2d 294, 303 (Wis. Ct. App. 2000)). *Red Arrow* indeed states that that such clauses "make[] clear that without Wausau's permission, no assignee or transferee has any rights to any benefits under the Wausau policies." 607 N.W.2d at 299 (citing *Loewenhagen v. Integrity Mut. Ins. Co.*, 473 N.W.2d 574, 577 (Wis. Ct. App. 1991)). But *Pepsi-Cola* clarified that *Red Arrow*'s language on the effect of anti-assignment clauses on post-loss assignments was dicta. 979 N.W.2d at 637. And it reaffirmed Wisconsin's adherence to the majority rule that anti-

WG&M's insurance policies to Wisconsin Gasket DE.[200] But reading the Purchase Agreement in its entirety, in view of Wisconsin precedent, shows that is not so.

Section 1.1 is framed in the future tense: it lays out the assets that "[WG&M] *will* transfer, convey, assign and deliver to [Wisconsin Gasket DE] . . . on the Closing Date."[201] The next section of the Purchase Agreement, Section 1.2, recognizes that a transfer is effectuated by separate instruments, and required WG&M to execute the necessary instruments by the closing date.[202] Specifically, Section 1.2 required WG&M to deliver at closing "[s]uch deeds, bills of sale, endorsements, assignments, and other good and sufficient instruments of conveyance and transfer . . . as shall be effective to vest in [Wisconsin Gasket DE] all of [WG&M's] right, title and interest in and to the assets" to be sold.[203]

Wisconsin law looks to those instruments as "the operative agreement[s] that actually effectuate[] [a] transfer" of rights under insurance policies.[204] *Pepsi-Cola*

assignment clauses in occurrence-based policies are unenforceable as to post-loss assignments, "provided, of course . . . that the assignment itself was otherwise valid." *Id.* at 634 (citation omitted).

[200] *See* Report at 32 ("Section 1.1 specifically transferred assets . . . . Therefore, the absence of Exhibit G—and, for that matter, the contents of Exhibit G—is immaterial.").

[201] Purchase Agreement § 1.1 (emphasis added).

[202] *Id.* §§ 1.2(a), (b).

[203] *Id.* § 1.2(a).

[204] *Pepsi-Cola*, 979 N.W.2d at 639 (citing *Bank of Am. NA v. Neis*, 835 N.W.2d 527, 541 (Wis. Ct. App. 2013), which cites *McDonald v. Nat'l Enters., Inc.*, 547 S.E.2d 204, 210 (Va. 2001)).

*Metropolitan Bottling Company, Inc. v. Employers Insurance Company of Wausau* makes that clear.[205] *Pepsi-Cola* considered whether decades-old insurance policies covered asbestos claims against a company that, like RWG, was the successor to an acquiror.[206] The parties to the acquisition signed a reorganization agreement calling for the transfer of "substantially all of the property, assets and business" of the seller, along with specified liabilities.[207] At closing, they signed a separate "Bill of Sale and General Assignment" conveying, among other things, "all" of the seller's "rights under contracts[] [and] insurance policies."[208] The Wisconsin Supreme Court observed that "the Bill of Sale is the operative agreement that actually effectuated the transfer of all of [the seller's] rights—including its rights under the [insurance] policies."[209] And it looked only to that document as evidence of which insurance policies were transferred.[210] Under *Pepsi-Cola*, Section 1.1 of the Purchase

---

[205] 979 N.W.2d at 630, 638–39.

[206] *Id.*

[207] *Id.*

[208] *Id.*

[209] *Id.* at 639 (citing *Bank of Am. NA v. Neis*, 835 N.W.2d at 541, which cites *McDonald*, 547 S.E.2d at 210 (noting that a bill of sale and assignment of loans was "an operative legal document that embodies and evidences [a] conveyance")); *see also Cooper Indus., LLC v. Columbia Cas. Co.*, 2018 WL 1770260, at *1 (N.J. Super. Ct. App. Div. Apr. 13, 2018) (noting that distributions of assets, including insurance rights, were "effectuated by Bills of Sale").

[210] *Pepsi-Cola*, 979 N.W.2d at 639 ("The contents of the schedule referenced in the Reorganization Agreement would only be relevant if the Bill of Sale stated that [the acquiror] only acquired the contract rights identified on the Schedule. The use of the term

Agreement alone does not establish Wisconsin Gasket DE effectively acquired the pre-Asset Sale policies.

Petitioner has not identified any instruments transferring any policy as contemplated by Section 1.2 and executed in the *Pepsi-Cola* transaction. Even interpreting Section 1.1 as evidence of the parties' intent to transfer all of WG&M's insurance policies, Petitioner has failed to prove those policies transferred to Wisconsin Gasket DE by contract.[211] Petitioner has not shown the pre-Asset Sale policies are "capable of vesting" and "represent significant potential indemnification

---

'all' in the Bill of Sale expressed [the seller's] intent to transfer all contract rights to [the acquiror].").

[211] The Report vaguely suggests that "even assuming the 1981 Purchase Agreement did not expressly transfer the insurance policies," the right to indemnity under the pre-Asset Sale policies transferred to Wisconsin Gasket DE by operation of law. Report at 34–35. Specifically, it suggests Wisconsin Gasket DE might have succeeded to WG&M's liabilities, and that where that occurs, "courts across the country have held that the right to insurance coverage can transfer as a matter of law from a predecessor to a successor even if the policies are not specifically listed on the pertinent transactional documents." Report at 34–38. The Intervenors explained *Red Arrow* explicitly rejected the Report's theory. DCo Opp. Br. 25; Continental Opp. Br. 17–18; Wausau Opp. Br. 12–13; *see* 607 N.W.2d at 299–303 (declining to adopt the holding in *N. Ins. Co. of N.Y. v. Allied Mut. Ins. Co.*, 955 F.2d 1353 (9th Cir. 1992)). Petitioner's briefing does not address a transfer by operation of law at all, or respond to the Intervenors. Petitioner waived any argument to that effect. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

value,"[212] such that they constitute assets of the Company within the purview of Section 18-804.[213]

### c. The Post-Asset Sale Insurance Policies Do Not Constitute Assets Of RWG.

Turning to the post-Asset Sale insurance policies, the Report identifies ten policies issued to Wisconsin Gasket DE and RWG Co.: (1) eight workers' compensation policies issued by Wausau and Travelers, with policy periods between 1986 and 1990,[214] and (2) two umbrella policies issued by Travelers, with policy

---

[212] *Krafft-Murphy*, 82 A.3d at 703, 704.

[213] Even if Section 1.1 alone offers sufficient evidence of transfer, no policy that could have transferred in the Asset Sale represents any "indemnification value." *See Krafft-Murphy*, 82 A.3d at 704. So even if Wisconsin Gasket DE effectively acquired the pre-Asset Sale policies by contract, they cannot constitute RWG assets within the purview of Section 18-804.

Most of the pre-Asset Sale policies cover periods before 1960, and would only apply to occurrences predating Cook's alleged exposure. *See supra* n.12 and accompanying text. The remaining four are umbrella and excess policies that do not provide coverage until the underlying liability limits have been exhausted. The Continental excess policy requires $1,500,000 to have been paid out on a personal injury claim before coverage attaches. *See* RX 88. The three Travelers umbrella policies require $500,000 to have been paid out on a personal injury claim before coverage attaches. *See* RX 89; RX 90; RX 91. All four excess and umbrella policies list Kemper as their underlying insurer. Kemper would be called Lumbermens, and Lumbermens would liquidate. *See* JX 45; JX 144 at RESP0007443. Petitioner has offered no evidence or argument about how these underlying limits could be exhausted in the absence of a solvent underlying insurer. *See infra* Part II.A.2.c.

[214] RX 69 (Travelers policy covering a policy period from September 1, 1986 through September 1, 1987); RX 94 (Wausau policy covering a policy period from September 1, 1986 through September 1, 1987); RX 70 (Travelers policy covering a policy period from September 1, 1987 through September 1, 1988); RX 95 (Wausau policy covering a policy period from September 1, 1987 through September 1, 1988); RX 71 (Travelers policy covering a policy period from September 1, 1988 through September 1, 1989); RX 96 (Wausau policy covering a policy period from September 1, 1988 through September 1,

periods between 1982 and 1984.[215] I address both categories in turn. I conclude Petitioner has failed to prove the post-Asset Sale insurance policies constituted assets of RWG when it dissolved.

The workers' compensation policies do not qualify as assets of RWG within the meaning of Section 18-804. They do not cover Petitioner's claim, as Petitioner's late husband was not employed by Wisconsin Gasket DE.[216] They do not cover the other pending claims against RWG, which are third-party asbestos-related claims. Petitioner says nothing about how the workers' compensation policies could otherwise offer RWG any "potential indemnification value" in view of pending or likely claims.[217]

The umbrella policies do not offer any value either. The umbrella policies obligate Travelers to "indemnify the insured for ultimate net loss in excess of the applicable underlying limit which the insured shall become legally obligated to pay as damages because of . . . [p]ersonal [i]njury . . . to which this policy applies, caused

---

1989); RX 97 (Travelers policy covering a policy period from September 1, 1989 through September 1, 1990); RX 98 (Wausau policy covering a policy period from September 1, 1989 through September 1, 1990).

[215] RX 92 (covering a policy period from December 5, 1982 through December 5, 1983); RX 93 (covering a policy period from December 5, 1983 through February 1, 1984).

[216] JX 93 ¶¶ 65–66.

[217] *Krafft-Murphy*, 82 A.3d at 704.

by an occurrence anywhere in the world."[218]  The "applicable underlying limit" is defined as "the amount of the applicable limits of liability of the policies of Underlying Insurance . . . less the amount or amounts, if any, by which any aggregate limit so stated has been reduced solely by payment of claims in respect of personal injury . . . ."[219]  The policies state that "[Travelers'] liability under this policy for ultimate net loss with respect to any occurrence . . . shall not attach until the amount of the applicable underlying limit has been paid by or on behalf of the insured."[220]  They also provide that "the limits of liability of any such policy of Underlying Insurance shall be deemed applicable irrespective of . . . the inability of the underlying insurer to pay by reason of bankruptcy or insolvency."[221]

That language is unambiguous.[222]  Travelers' duty to indemnify does not attach unless and until the remaining applicable limits of the underlying insurance have been exhausted by covered personal-injury payments.  The umbrella does not drop down by virtue of the underlying insurer's "bankruptcy or insolvency."[223]

---

[218] RX 92 § 2.1; RX 93 § 2.1.

[219] RX 92 § 5.3(a); RX 93 § 5.3(a).

[220] RX 92 § 6.5; RX 93 § 6.5.

[221] RX 92 § 5.3; RX 93 § 5.3.

[222] *See Cont'l W. Ins. Co. v. Paul Reid, LLP, GPS, Inc.*, 715 N.W.2d 689, 692 (Wis. Ct. App. 2006) ("[W]hen a policy's language is unambiguous, we apply it as written, without resorting to rules of construction." (citing *Folkman v. Quamme*, 665 N.W.2d 857, 871 (Wis. 2003))).

[223] RX 92 § 5.3; RX 93 § 5.3.

Each umbrella policy lists an underlying Lumbermens primary policy with an aggregate liability limit of $500,000.[224] For umbrella coverage to kick in, $500,000 per underlying insurance policy must be exhausted—i.e., "reduced solely by payment of claims in respect of personal injury."[225] Petitioner cites to no evidence indicating the underlying primary policy limits have been so exhausted.

The Receiver hypothesizes an easy way out of this problem: "RWG could pay it. Another insurer could pay it. A third-party could pay it."[226] But this hypothesis finds no basis in the record. Petitioner offers no evidence suggesting RWG has any capital on hand to exhaust the underlying primary policy limits. DCo has maintained throughout this litigation that RWG lacks capital,[227] and certainly neither Petitioner nor the Receiver has found any.[228] Petitioner identifies no other primary or lower-level excess policies covering the same policy periods, and capable of making payments on covered claims. Based on the Report, there do not seem to be any. And

---

[224] RX 92 at RWG_TRAV000072; RX 93 at RWG_TRAV000115. The umbrella policies also list an underlying automotive insurance policy and an employers' liability policy. The liability limits of those underlying policies, which do not cover asbestos-related personal-injury claims, are inapplicable here. *See* RX 92 at RWG_TRAV000072; RX 93 at RWG_TRAV000115.

[225] RX 92 § 5.3(a); RX 93 § 5.3(a).

[226] Report at 47.

[227] *See, e.g.*, Stringham Tr. 170 ("Q. [RWG] had no money? A. Correct. Q. It had no ability to pay its bills? A. That's correct.").

[228] *See* Pet'r's Opening Br. 7 ("RWG also knew it was insolvent when it dissolved.").

Petitioner offers no context for the assertion that some unidentified third party can step in.

From there, Petitioner points to Travelers' duty to defend.[229] While an insurer's duty to defend is ordinarily broader than its duty to indemnify,[230] the existence and contours of that duty remain bounded by the "language in the insurance contract."[231] Petitioner contends Travelers' duty to defend is valuable to RWG because, under Section 2.3(a) of the umbrella policies, it would necessarily attach in the absence of a collectible underlying insurance policy.[232] I do not read Section 2.3(a) that way. Section 2.3(a) commits Travelers to "defend any suit seeking damages which are not payable on behalf of the insured under the terms of the policies of Underlying Insurance . . . or any other available insurance," but which

---

[229] Hr'g Tr. 13–14 (contending the "obligation [to defend] attach[es] in the absence of an underlying policy"); *see Johnson Controls, Inc. v. London Mkt.*, 784 N.W.2d 579, 586 (Wis. 2010) (noting that the "duty to indemnify and the duty to defend are separate contractual obligations" (citing *Radke v. Fireman's Fund Ins. Co.*, 577 N.W.2d 366, 369 (Wis. Ct. App. 1998), *overruled in part on other grounds by Marks v. Houston Cas. Co.*, 881 N.W.2d 309 (Wis. 2016))).

[230] *See Red Arrow*, 607 N.W.2d at 298 ("An insured's duty to defend is broader than its duty to indemnify because the duty to defend exists when it is merely arguable that the policy in question provides coverage." (citing *Radke*, 577 N.W.2d at 369)); *Acuity v. Chartis Specialty Ins. Co.*, 861 N.W.2d 533, 539–40 (Wis. 2015) ("[T]he duty to defend depends upon the nature, not the merits, of the claim against the insured, while the duty to indemnify depends on the merits of the claim." (citations omitted)).

[231] *Johnson Controls, Inc.*, 784 N.W.2d at 586 (internal quotation marks and citation omitted).

[232] Hr'g Tr. 13–14.

"are payable under the terms of Section 2.1," due to either of the following circumstances: (1) because "such damages are not covered thereunder," or (2) because of "exhaustion of an underlying aggregate limit of liability by payment of claims."[233]

The first circumstance is inapplicable because damages for asbestos-related personal-injury claims are "covered" by the underlying insurance. I read Petitioner's argument to suggest such damages cannot be "covered" by the underlying Lumbermens policies due to Lumbermens' liquidation. But "the terms 'covered' and 'not covered' refer to whether the policy insures against a certain risk, not whether the insured can collect on an underlying policy."[234] "Insurance policies 'cover' what they *say* they cover."[235] The underlying Lumbermens primary policy, by its terms, plainly covers damages for asbestos-related personal-injury claims.[236]

---

[233] JX 92 § 2.3(a); RX 93 § 2.3(a).

[234] *Pergament Distribs., Inc. v. Old Republic Ins. Co.*, 513 N.Y.S.2d 467, 468 (N.Y. App. Div. 1987) (citations omitted); *St. Paul Travelers Cos., Inc. v. Corn Island Shipyard, Inc.*, 495 F.3d 376, 385–86 (7th Cir. 2007); *Arkwright-Boston Mfrs. Mut. Ins. Co. v. Aries Marine Corp.*, 932 F.2d 442, 446–47 (5th Cir. 1991); *cf. Muehlenbein v. W. Bend Mut. Ins. Co.*, 499 N.W.2d 233, 237 (Wis. Ct. App. 1993) ("They ask us to interpret the exclusion to allow for excess coverage by implying that a claim is not 'covered' if the policy limits are insufficient to provide complete compensation. We reject this interpretation.").

[235] *5 Walworth, LLC v. Engerman Contr., Inc.*, 963 N.W.2d 779, 781 (Wis. Ct. App. 2021) (emphasis added); *see also Kemp v. Feltz*, 497 N.W.2d 751, 753 (Wis. Ct. App. 1993) ("Whether certain conduct falls within the coverage granted by an insurance policy is an issue governed by the insurance contract's terms and conditions." (citing *Paape v. N. Assurance Co. of Am.*, 416 N.W.2d 665, 668 (Wis. Ct. App. 1987))).

[236] *See* JX 11.

The second circumstance is inapplicable because, as explained, there is no evidence the primary insurance layer has been exhausted. Accordingly, Petitioner has not shown RWG's rights to indemnity and defense under any of the post-Asset Sale insurance policies were available to set aside for pending or likely claims when RWG dissolved.

Petitioner has not offered a preponderance of the evidence to show RWG had any contingent rights under insurance policies "capable of vesting" and worth "significant potential indemnification value" when it dissolved. [237]

### 3. Litigable Claims

As a last resort, Petitioner argues RWG possesses contingent rights in the form of litigable claims. Delaware law treats litigable claims as corporate assets. [238] A familiar example is a derivative claim—a claim belonging to the company and

---

[237] *Krafft-Murphy*, 82 A.3d at 703, 704.

[238] *See, e.g.*, *Sehoy Energy LP v. Haven Real Est. Gp., LLC*, 2017 WL 1380619, at *1 (Del. Ch. Apr. 17, 2017) ("A cause of action brought on behalf of an entity is an asset of that entity."); *Ellis v. Gonzalez*, 2018 WL 3360816, at *1 (Del. Ch. July 10, 2018) ("[C]hoses in action . . . are assets of the corporation."); *Oliver v. Boston Univ.*, 2006 WL 1064169, at *19 (Del. Ch. Apr. 14, 2006) ("Derivative claims are, of course, assets of the corporation."); *Porter v. Tex. Com. Bancshares, Inc.*, 1989 WL 120358, at *5 (Del. Ch. Oct. 12, 1989) ("If the company has substantial and valuable derivative claims, they, like any asset of the company, may be valued in an appraisal."); *Nagy v. Bistricer*, 770 A.2d 43, 55 n.23 (Del. Ch. 2000) ("To the extent that the entity possessed valuable legal claims, the value of those claims is part of the overall value of the entity.").

asserted on behalf of the company.[239]  Against this backdrop, Petitioner argues "[a]ll

this Court needs to determine is whether RWG has good-faith litigable claims."[240]

Litigable claims are not valuable assets for all intents and purposes.  *In re Primedia, Inc. Shareholders Litigation*, the lone authority on which Petitioner relies, makes this point clear.[241]  *Primedia* itself looked to whether an underlying derivative claim was "viable" and "material," so as to confer direct standing on plaintiffs wishing to challenge a merger based on the board's failure to secure value for that derivative claim.[242]  It explained that "the value of the derivative claim must be material in the context of the merger," and "[i]f the underlying derivative action is not viable, then there is no litigation asset to value or maintain."[243]

So too here.  Section 18-804's reach is limited: a litigable claim constitutes an asset of the Company insofar as it can reasonably provide for pending or likely claims.  And under *Krafft-Murphy*, contingent rights, including litigable claims, constitute assets insofar as they are "capable of vesting" and "represent significant

---

[239] *See Weinberger v. Lorenzo*, 1990 WL 156529, at *2 (Del. Ch. Oct. 12, 1990).

[240] Pet'r's Reply Br. 10; *see also* Pet'r's Opening Br. 8–9.

[241] 67 A.3d 455 (Del. Ch. 2013).

[242] *Id.* at 477–83.

[243] *Id.* at 477.

potential [] value."[244]   A certificate of cancellation will not be nullified simply because one could conjure up a possible litigable claim.

Petitioner has not established RWG holds litigable claims that offer any value. The Receiver first conjures litigable coverage claims out of the fact that insurance companies intervened in this action to protect their interests. Those companies had a legally cognizable interest in policies Petitioner identified as assets.[245]   That interest is not tantamount to a value-producing claim under those policies. To the contrary, as explained, none of the policies in question offer any value.

Next, the Report states in a single paragraph that "RWG also has litigable claims for breach of fiduciary duty against its directors and officers[,] and aiding and abetting claims against DCo and [EUSI]."[246]   The Receiver did not detail these claims in the Report, instead noting he is "available to discuss these claims *in*

---

[244] *Krafft-Murphy*, 82 A.3d at 703, 704.

[245] D.I. 180; D.I. 251; *see In re Reinz Wis. Gasket, LLC*, 2023 WL 3300042, at *3 (Del. Ch. May 8, 2023); *Tex. E. Overseas*, 2009 WL 4270799, at *1; *In re Fletcher Constr. Co. of N. Am.*, 2023-1038-MTZ, D.I. 24; *see also Surf's Up Legacy P'rs, LLC v. Virgin Fest, LLC*, 2021 WL 6012782, at *3 (Del. Super. Dec. 16, 2021) (explaining that "standing under Rule 24 turns on whether [the movant's] claimed interest is one that is legally enforceable"); *In re AMC Ent. Hldgs., Inc. S'holder Litig.*, 2023 WL 2518479, at *2–3 (Del. Ch. Mar. 15, 2023) ("Standing is a requirement for both mandatory and permissive intervention." (citations omitted)); *Flynn v. Bachow*, 1998 WL 671273, at *4 n.15 (Del. Ch. Sept. 18, 1998) ("The interest that an intervenor claims must be one cognizable by law; therefore, if the intervenor lacks standing to assert the claim, *ipso facto*, the intervenor's interest cannot be recognized.").

[246] Report at 49.

*camera*" due to privilege and work product concerns."[247]  Petitioner did not press

these claims or seek any *in camera* review.  Petitioner has not carried her burden to

prove that any alleged fiduciary duty claim could provide value.

In any case, no fiduciary duty is owed to claimants like Petitioner.[248]  And any

breach of fiduciary duty owed to RWG and its sole member DCo[249] is largely

exculpated under RWG's Operating Agreement, so a claim for such a breach would

yield value only in extreme circumstances:

> No Member, Manager, or officer shall have any personal obligation for
> any liabilities of the Company solely by reason of being a Member,
> Manager or officer, except as provided by law.  No Member, Manager
> or officer shall have any liability to the Company arising out of a
> transaction, occurrence or course of conduct unless he, she or it has
> engaged in ***willful misconduct or a knowing violation of criminal law***

---

[247] *Id.* at 49–50.

[248] *See Kelly v. Blum*, 2010 WL 629850, at *10 (Del. Ch. Feb. 24, 2010) ("[U]nless the LLC agreement in a manager-managed LLC explicitly expands, restricts, or eliminates traditional fiduciary duties, managers owe those duties to the LLC and its members.").

Petitioner asserts she was owed fiduciary duties when RWG entered the "zone of insolvency," and then once it became insolvent.  Pet'r's Opening Br. 6.  Not so.  In Delaware, "[t]here is no legally recognized 'zone of insolvency' with implications for fiduciary duty claims." *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 115 A.3d 535, 546 (Del. Ch. 2015) (citing *N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 94 (Del. 2007)).  While "in insolvency creditors become the ultimate risk bearers in LLCs," fiduciary duties continue to run to the LLC and its members. *CML V, LLC v. Bax*, 28 A.3d 1037, 1043 (Del. 2011).  And in any case, Petitioner is not a creditor of RWG. *See* Post-Trial Op. at *3–4.

[249] JX 46 § 2; *see William Penn P'ship v. Saliba*, 13 A.3d 749, 756 (Del. 2011) ("[M]anagers of a Delaware limited liability company owe traditional fiduciary duties of loyalty and care to the *members* of the LLC, unless the parties expressly modify or eliminate those duties in the operating agreement." (emphasis added)).  The Operating Agreement does not contain a fiduciary duty waiver.

53

***or has knowingly exceeded the authority granted by or pursuant to this Agreement.***[250]

Petitioner attempts to work around this issue by shifting from tort to contract, invoking the implied covenant of good faith and fair dealing. Specifically, she recites the truism that breaches of the implied covenant cannot be exculpated, and argues there is "a litigable claim that RWG's officers and directors acted in bad faith when actively opposing the interests of claimants."[251]

But claimants like Petitioner have no claim for breach of the implied covenant. The implied covenant entitles a contractual party to expect the other contractual party to be reasonable in exercising a discretionary right.[252] RWG and DCo contracted to vest DCo with sole discretion over the decision to dissolve RWG.[253] RWG was thus entitled to expect DCo to act reasonably in exercising that discretion. But the implied covenant does not "establish a free-floating requirement that a party act in some morally commendable sense,"[254] or a "'free-floating duty . . . unattached

---

[250] JX 46 § 13.

[251] Pet'r's Reply Br. 13.

[252] *See Johnson & Johnson v. Fortis Advisors LLC*, --- A.3d ---, 2026 WL 89452, at \*16 (Del. Jan. 12, 2026); *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146–47 (Del. Ch. 2009); *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 2009 WL 3756700, at \*5 (Del. Ch. Nov. 9, 2009); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984), *aff'd*, 575 A.2d 1131 (Del. 1990).

[253] JX 46 §§ 5–(A) ("[T]he Company shall be dissolved upon . . . [t]he election of the Member to dissolve and terminate the Company.").

[254] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 2014 WL 2819005, at \*10 (Del. Ch. June 20, 2014).

to the underlying legal document.'"[255] What is "reasonable" or "unreasonable" turns on "the parties' original contractual expectations, not a 'free-floating' duty applied at the time of wrong."[256] The question is whether DCo's exercise of its discretion harmed RWG, not tort claimants that are not parties to RWG's Operating Agreement.[257]

And an implied covenant claim offers RWG no value. "[T]he purpose of the implied covenant is to ensure that a party to a contract is not prevented 'from receiving the fruits of the bargain.'"[258] Consistent with that purpose, a claim for breach of the implied covenant requires "some injury to [a party's] contractual interest."[259] RWG had been inoperative for over a decade when it dissolved, and it had no assets.[260] DCo's decision to dissolve RWG did not cause it any harm.

For that same reason, an aiding and abetting claim against DCo and EUSI offers RWG no value. Setting aside the lack of a predicate breach, I see no basis for

---

[255] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (quoting *Glenfed Fin. Corp., Com. Fin. Div. v. Penick Corp.*, 647 A.2d 852, 858 (N.J. Super. Ct. App. Div. 1994)).

[256] *ASB Allegiance Real Est. Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 442 (Del. Ch. 2012) (citing *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010)), *rev'd on other grounds*, 68 A.3d 665 (Del. 2013).

[257] And Petitioner herself has already settled with DCo. Boyle Aff. Ex. 3.

[258] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) (quoting *Dunlap*, 878 A.2d at 442).

[259] *Kuroda*, 971 A.2d at 888–89.

[260] *See* JX 41 at ENT000167; JX 44; Trial Tr. 109.

"quantifiable damages that are 'logically and reasonably related to [a] harm or injury,'" as required to successfully assert an aiding and abetting claim."[261]

Petitioner has not shown RWG holds litigable claims constituting assets within the purview of Section 18-804.

## B.    Request To Expand Receiver's Authority

Petitioner has failed to carry her burden to prove by a preponderance of the evidence that RWG had assets it failed to set aside for claimants when it dissolved. As such, I need not address Petitioner's request allow the Receiver to marshal any purported assets.

## III.    CONCLUSION

For the foregoing reasons, the Motion is **DENIED**.  The parties shall confer and submit a stipulated implementing order that addresses the Motion, the Receiver's future service, and Continental's counterclaim consistent with this opinion.

---

[261] *Lake Treasure Hldgs., Ltd. v. Foundry Hill GP LLC*, 2014 WL 5192179, at \*12 (Del. Ch. Oct. 10, 2014) (quoting *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773 (Del. 2006)); *see also In re Mindbody, Inc., S'holder Litig.*, 332 A.3d 349, 389 (Del. 2024) (reciting the elements of an aiding and abetting breach of fiduciary duty claim, including "damages proximately caused by the breach").